MAGLOIRE BERUBE, administrator, vs. NEW YORK, NEW HAVEN, AND HARTFORD RAILROAD COMPANY.

Bristol.   October 27, 1919. — January 9, 1920.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, & CARROLL, JJ.

*Way*, Private.  *Negligence*, Licensee or invited person, Railroad, Causing death. *Railroad*.

A city in 1862 purchased a portion of a farm as part of a proposed location for a railroad, the owner's deed to the city containing a reservation of "one cattle pass" across the location. This crossing was the only means of access from the farm buildings to a mowing lot and to a shore for seaweed to be used as fertilizer. The railroad company constructed a plank crossing, erected and maintained a gate at the crossing, posted an extract from a statute requiring that persons using the gate should close it after use and a sign stating that the crossing was a private crossing and was dangerous. The land on both sides of the crossing was maintained as a farm until 1906, when a son who was the successor in title of the original grantor sold the land on the shore side to one who developed it as a summer colony. Thereafter the crossing was used by persons in the colony and, while the signs were maintained, the gate was often left open. One of the summer colony in the night time caught his foot in a defect in the crossing and was run over by a passing train and died from the result of his injuries. In an action against the railroad company by the administrator of the estate of the person so run over for his conscious suffering and also for causing his death, it was *held*, that

(1) The reservation in the deed in 1862 could not be extended by implication so as to embrace within the scope and obligation of the defendant's "invitation" the residents of the summer colony;

(2) The evidence did not warrant a finding that the defendant maintained the crossing for the use of the public;

(3) The rights of the decedent were those of a licensee, to whom the defendant owed no duty except to refrain from injuring him intentionally or wantonly;

(4) There being no evidence of a violation of such duty, a finding for the plaintiff was not warranted, either under a count for causing the conscious suffering of the decedent or under one for causing his death.

TORT, by the administrator of the estate of William M. Berube, the declaration containing separate counts for causing personal injuries and others for causing the death of the plaintiff's intestate.  Writ dated November 14, 1917.

In the Superior Court the action was tried before *J. F. Brown, J.*

There was evidence that, in crossing the defendant's track in the night time, a foot of the plaintiff's intestate became caught between the planking and the rail at the crossing described in the opinion, that a train of the defendant approached without warning bell or whistle and that his legs were run over and both of them were cut off, from which injuries he died about four hours later. Other material evidence is described in the opinion.

At the close of the evidence, a verdict for the defendant was entered by order of the judge; and the plaintiff alleged exceptions.

St. 1906, c. 463, Part II, §§ 147, 245, are as follows: ..

"Section 147.  Every railroad corporation shall cause a bell of at least thirty-five pounds in weight, and a steam whistle, to be placed on each locomotive engine passing upon its railroad; and such bell shall be rung or at least three separate and distinct blasts of such whistle sounded at the distance of at least eighty rods from the place where the railroad crosses upon the same level any highway, town way or travelled place over which a signboard is required to be maintained as provided in sections one hundred and forty-nine and one hundred and fifty; and such bell shall be rung or such whistle sounded continuously or alternately until the engine has crossed such way or travelled place. The provisions of this section shall not affect the authority conferred upon the board of railroad commissioners by the provisions of the following section."

"Section 245.  If a person is injured in his person or property by collision with the engines or cars of a railroad corporation at a crossing such as is described in section one hundred and forty-seven, and it appears that the corporation neglected to give the signals required by said section, and that such neglect contributed to the injury, the corporation shall be liable for all damages caused by the collision, or to a fine recoverable by indictment as provided in section sixty-three of Part I, or, if the life of a person so injured is lost, to damages recoverable in an action of tort, as provided in said section, unless it is shown that, in addition to a mere want of ordinary care, the person injured or the person who had charge of his person or property, was at the time of the collision, guilty of gross or wilful negligence, or was acting in violation of the law, and that such gross or wilful negligence or unlawful act contributed to the injury."

*C. R. Cummings, (J. W. Nugent & J. B. Cummings* with him,) for the plaintiff.

*J. L. Hall,* for the defendant.

De Courcy, J.   The plaintiff, as administrator of the estate of his minor son, William M. Berube, seeks to recover damages for the conscious suffering and death of the intestate, who was struck by a train of the defendant at the so called Mount Hope Avenue crossing in Fall River on Sunday, October 7, 1917, about 9:45 P. M.   By order of the trial judge a verdict was returned for the defendant on all the evidence; and the only question raised by the report is whether that ruling was right.

In order to determine the controlling issue, whether the intestate was an invitee or merely a licensee in walking across the track when he was injured, it is necessary to consider the history and use of this crossing.   In 1862 Samuel B. Allen owned a farm in the neighborhood.   On March 11 of that year the city of Newport purchased from Allen a portion of his land, as part of the proposed location of the Newport and Fall River Railroad Company, which land was later conveyed by the city to the Old Colony Railroad Company, the predecessor in title of the defendant.   The railroad location, about eighty-two feet in width, cut through Allen's farm, leaving some eleven and one half acres on the westerly side, toward Mount Hope Bay. · The farm house was on the easterly side, ten hundred or twelve hundred feet from the railroad.   There was no "Mount Hope Avenue" at that time; and when it was laid out (when or by whom this was done does not appear) it became necessary to move the house back to the north side of the "Avenue."   There was no building on the eleven and one half acre lot west of the railroad.   That portion of the farm was used for raising hay, although at times four or five acres of it were used for garden purposes.

Samuel B. Allen, in his deed to the city of Newport dated March 11, 1862, reserved a right to cross the land conveyed, in the following words: "And the said Allen for the purpose of cross-ing the Road of the Newport & Fall River Railway Company, shall have free of cost one cattle pass near the southerly end of the land hereby conveyed, and one Farm crossing either by a Bridge or at Grade at the election of said Company, near a point where the land leading by the westerly side of his house continued

will intersect said Railroad, or however bounded, with all the appurtenances thereto belonging."

The track was laid in a northerly and southerly direction, Fall River being to the north and Newport to the south. At the crossing in question the railroad company laid planks, about twelve feet long, between the rails. West of this planking was constructed a box, about fourteen feet long, through which to run the switch wires. This crossing was the only means of access to the mowing lot west of the track, and was used in carting hay and vegetables from that lot, and seaweed for manure from the shore. The railroad company erected a gate across the travelled way on one or both sides of the location. On the west side of the track was maintained a sign, reading as follows: "Extract from the General Laws, Chap. 187, Sec. 28. Whoever enters upon or crosses a railroad at any private way which is closed by gates or bars, and neglects to close them securely, shall be fined not less than two dollars nor more than ten dollars, and shall be liable for the damage sustained therefrom. This is a private way, and the gate or bars must be closed each time the crossing is used." * On each side of the location was a large sign, with the words: "Private Crossing. Dangerous. Look out for trains. New York, New Haven & Hartford Railroad Co." Mount Hope Avenue, which comes down to the crossing from the east, never was laid out as a public way. As described by witnesses, and as apparent from the photographs, it is now a rough dirt road, which drops about three feet down to the planking on one side, and goes up about two feet on the other side.

So far as appears there was no change in the premises or in the use made of the crossing until after the death of Samuel B. Allen, and of his widow, who died in 1906 or 1907. In 1908, Arthur W. Allen, son of Samuel B., and successor to his title, sold the portion of the farm which was west of the railroad and extended to the Bay, to Frederick L. Lavin, doing business as manager of the Pilgrim Land Company, Providence, Rhode Island. The purchaser divided the land into streets and house lots, shown on a "Plan of Mount Hope Terrace;" and under a "boom" or development scheme the lots were sold on the instalment plan. The result

* The foregoing "extract" is from General Laws of the State of Rhode Island, 1896.

was to transform the old mowing land into a colony of summer homes. The number of people who made use of this crossing, especially during the summer, was greatly increased. The signs were maintained, but the gates which always had been closed by · Samuel B. Allen and his workmen after using the crossing were often left open, and one of them apparently was gone at the time of the accident. The track supervisor testified, "we have never succeeded in having those gates remain closed any length of time," although the section men who patrol the track daily were instructed "to do the best they can to keep the gates closed."

The plaintiff in June, 1909, made an agreement for the purchase of lot numbered 299´ and was to get a deed when the price ($375) should be paid by the weekly instalments of one dollar. He carried on business in Fall River as a barber. His son William M. (the intestate), worked in the Chace mill and helped his father during the evening in the barber shop.

From the foregoing facts it is plain that the way over this crossing where the plaintiff's intestate was injured, was laid out as a private farm crossing under the reservation contained in the deed from Samuel B. Allen in 1862. Allen used it as such, and with the permission of the railroad company, until his death in 1890 or later. No other or more extensive right was created by prescription prior to 1892, and none could be so acquired across a railroad track since that date. St. 1906, c. 463, Part II, § 125. Assuming that the reservation in the deed was not merely for the lifetime of the grantor, but was intended to continue for the benefit of the two portions of the farm unit (*Childs* v. *Boston & Maine Railroad*, 213 Mass. 91), it cannot be extended by implication so as to embrace within the scope and obligation of the defendant's "invitation" the residents of this large summer colony, the existence of which was not contemplated when the deed was executed in 1862. It cannot seriously be urged that the intestate was using the crossing for farm purposes, under the right reserved to Allen, because of the fact that the plaintiff raised some potatoes in his garden. Nor would the evidence warrant a finding that the defendant maintained the crossing for the use of the public, as alleged in the last four counts. See *Hanks* v. *Boston & Albany Railroad*, 147 Mass. 495. It was obliged to maintain a crossing for farm purposes, under the reservation in the Allen deed. What-

ever it did was consistent with this limited obligation, and inconsistent with a claim of "an implied representation that the place was a public [crossing] which might be used with safety, and an inducement to use it as such, which inducement, like an express invitation, creates a duty to provide for the safety of the users." *Bowler* v. *Pacific Mills*, 200 Mass. 364, 366, and cases cited. *Sprow* v. *Boston & Albany Railroad*, 163 Mass. 330.

The plaintiff's intestate, when injured, had only the rights of a licensee. In using the crossing he took the premises as he found them, and went there at his own risk. The defendant would be liable only in case it injured him intentionally or wantonly. This is true alike as to the plaintiff's counts for conscious suffering, and those to recover the statutory fine for causing death. The liability of the railroad for loss of life which is created by the statute, is based upon its negligence, that is, the violation of a legal duty it owed to William M. Berube. *Bernabeo* v. *Kaulback*, 226 Mass. 128, 131. In the case presented on this record that duty was to refrain from intentional, wanton or reckless conduct exposing him to danger. St. 1906, c. 463, Part I, § 63. *Dahlgren* v. *Boston & Maine Railroad*, 210 Mass. 243. See *Brooks* v. *Fitchburg & Leominster Street Railway*, 200 Mass. 8. It may be added that § 245, by which a railroad corporation is made liable for failure to give the statutory signals at grade crossings, such as are described in § 147, is not applicable to the private farm crossing where the plaintiff's intestate was injured.

As the ruling of the trial judge was right, judgment must be entered for the defendant on the verdict, in accordance with the terms of the report.

*So ordered.*